## In re PROTEST OF BENDELARI, Agent, GROSS PRODUCTION TAX, 1919.

No. 11190—Opinion Filed Jan. 8, 1921.

Dissenting Opinion Filed Feb. 23, 1921.

Rehearing Denied May 31, 1921.

(Syllabus.)

1. **Taxation—Property Subject—Statute.**

Section 7302, Revised Laws 1910, provides: "All property in this state, whether real or personal, including the property of corporations, banks, and bankers, except such as is exempt, shall be subject to taxation."

2. **Same—Property of Agent of Government.**

No constitutional implications prohibit a state tax upon the property of an agent of the government, merely. because it is the property of such agent.

3. **Same—Power of State.**

Although a corporation may be an agent of the United States, the state may levy a property tax upon its property, and when Congress has not interposed to protect said property from state taxation, said taxation is not obnoxious to that objection.

4. **Same.**

Property which has acquired a situs within the jurisdiction of the state is not exempt from taxation by the state simply because it is exclusively used by the owner in carrying out a contract with the government.

5. **Same—Gross Production Tax on Mine Production—Validity.**

The gross production tax provided for by chapter 39, Session Laws 1916, which pro

vides that said tax shall be in lieu of all other taxes upon said property, and further provides that if the tax assessed is greater than the amount said property would be subject to upon an ad valorem basis in the tax district where it is situated, the state may lower the rate in accordance therewith, is not a tax upon the earnings of the producer of mining ore, nor upon its right to engage in business, but is a tax upon the producer's property within the state.

KANE and MILLER, JJ., dissenting.

Appeal from ruling of the State Board of Equalization in the matter of the protest of A. E. Bendelari, agent, of gross production tax for 1919. Affirmed.

Ray McNaughton and A. C. Wallace, for appellant.

S. P. Freeling, Atty. Gen., and C. W. King, Asst. Atty. Gen., for the State.

McNEILL, J. This controversy arose by A. E. Bendelari, agent, making returns to State Auditor of the amount of gross production of lead and zinc mining ore produced from certain mines for the quarter ending the 1st of April, 1919. The returns embraced 18 separate and distinct leases, and a separate return was made for each lease and included the payment to the State Auditor of the tax as required by section 1, chap. 39, Session Laws 1916, in sums ranging from $12 to $450 upon each lease. At the time of making the return and paying said amounts to the State Auditor notices were filed with the auditor that the payment on each lease was paid under protest. Thereafter, as provided in chapter 39, supra, the protest was submitted to the State Board of Equalization upon an agreed statement of facts to determine the following questions, to wit:

First. Whether or not. the ore produced from said leases is subject to a gross production tax.

Second. If the gross production tax is illegal, is the concentrating plants and the tangible property of the lessee which is placed upon said lease subject to be taxed on an ad valorem basis?

Upon said agreed statement of facts, the State Board of Equalization overruled the protest filed by said company and disallowed the same. From said order, the agent has appealed and the same is now. before this court for consideration.

We will consider the second question first: Whether the concentrating plant and all tangible property of the plaintiff in error, which would include the ore at the pit's mouth, is subject to an ad valorem tax. The plaintiff in error is not the owner of the land from which the ore is produced, but is producing

the same under the terms of separate mining leases upon each tract of land. The lands were patented by different members of the Quapaw Indians under the act of Congress approved March 2, 1895, and the patents contained restrictions against alienation for a period of 25 years.

It is further agreed that the lease was executed upon authority of the act of Congress of June 7, 1897, which provided, in substance, as follows:

"The allottees of land within the limits of the Quapaw agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof. for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes."

The act further provides:

"That whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottees cannot improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the secretary, upon such terms and conditions as shall be prescribed by him."

It is admitted, as to the lands upon which the leases, or a part of the same are executed, that the Indians have been considered incompetent, and the royalty is paid to the Secretary of the Interior and disbursed by him; that other Indians who executed their leases were competent under the leasing act of June 7, 1897, and said leases were not approved by the secretary, nor has the Indian ever been declared incompetent under said act, nor were the royalties paid to the secretary for the Indian.

It is further agreed that the agent owned concentrating plants and other tangible property upon each lease and the same was used exclusively for producing ore from each lease. It was further agreed that the agent had made no return of its property for the purpose of taxation upon an ad valorem basis and had paid no tax to the state upon any of the property situated upon said lease upon an ad valorem basis for the year 1919.

It will therefore be seen that there is no controversy in this proceeding between the state and the allottee, or the Indian, and there is no attempt to tax any of the Indian's property, nor the royalty that he has received or is to receive from the mining lease.

The plaintiff in error, however, contends that the concentrating plant, the machinery or ore at the pit mouth, and all tangible property owned by the plaintiff in error is not subject to taxation, for the reason it is

an attempt to impose a tax upon a federal agency, or upon the means and instrumentality by which the government was performing its duty, right, and obligation to its Indian wards in the operation of restricted lands for mining purposes. With this contention we are unable to agree. Section 7302, Rev. Laws 1910, is as follows:

"All property in this state, whether real or personal, including the property of corporations, banks, and bankers, except such as is exempt, shall be subject to taxation."

This property, being tangible property, is by virtue of this provision of the statute and the decisions of this state subject to taxation, unless it is exempt by reason and by virtue of the same being used in operating a mining lease upon the land of restricted Indians over which the government has superintending control. We have been unable to find any case where such exemption has ever been sustained by any state court or the Supreme Court of the United States. The question has been before the Supreme Court of the United States on many occasions, and their uniform holding has been that an exemption from taxation of a federal agency does not extend to property of the agent.

One of the numerous cases decided by the Supreme Court of the United States is the case of Union Pacific Railroad v. Wm. S. Peniston, 18 Wall. 5-50, 21 L. Ed. 787; the third and fourth paragraphs of the syllabus of the opinion being as follows:

"3. The property of the Union Pacific Railroad, although the corporation was created by Congress, and the company is an agent of the general government, designed to be employed and actually employed in the legitimate service of the government, both military and postal, is not exempt from state taxation.

"4. No constitutional implications prohibit a state tax upon the property of an agent of the government, merely because it is the property of such agent."

The court in the opinion used the following language:

"It is, therefore, manifest that exemption of federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform."

The Supreme Court of the United States, in the case of Thomas v. Gay, 169 U. S. 264.

42 L. Ed. 740, in the body of the opinion stated as follows:

"As to that portion of the argument which claims that, even if the Indians were not interested in any way in the property taxed, the territorial authorities would have no right to tax the property of others than Indians located upon these reservations, it is sufficient to cite the cases of Utah & Northern Railway v. Fisher, 116 U. S. 28, and Maricopa & Phoenix Railroad v. Arizona, 156 U. S. 347, in which it was held that the property of railway companies traversing Indian reservations are subject to taxation by the states and territories in which such reservations are located.

"But it is urged that the Indians are directly and vitally interested in the property sought to be taxed, and that their rights of property and person are seriously affected by the legislation complained of; that the money contracted to be paid for the privilege of grazing, is paid to the Indians as a tribe, and is used and expended by them for their own purposes, and that if, by reason of this taxation, the conditions existing at the time the leases were executed were changed, or could be changed by the Legislature of Oklahoma at its pleasure, the value of the lands for such purposes would fluctuate or be destroyed altogether according to such conditions.

"But it is obvious that a tax put upon the cattle of the lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians. A similar contention was urged in the case of Erie Railroad v. Pennsylvania, 158 U. S. 431. There the state of Pennsylvania had imposed a tax upon a railroad, situated within the borders of that state, but leased to another railroad company engaged in carrying on interstate commerce, and this tax was measured by a reference to the amount of the tolls received by the lessor company from the lessor company. It was claimed that the imposition of a tax on tolls might lead to increasing them in an effort to throw their burthen on the carrying company, and thus, in effect, become a tax or charge upon interstate commerce. But this court held that such a tax upon tolls was too indirect and remote to be regarded as a tax or burthen on interstate commerce. A similar view was taken in the case of Henderson Bridge Co. v. Kentucky, 166 U. S. 150. where a tax imposed by the state of Kentucky on the intangible property of a company which owned and maintained a bridge over a river between two states was contended to be objectionable as constituting a burthen upon interstate commerce, but it was held that the fact that the tax in question was to some extent affected by the amount of the tolls received, and therefore might be supposed to increase the rate of tolls and thus be a burthen on interstate commerce. was too remote and incidental to make it a tax on the business transacted.

Adams Express Co. v. Ohio State Auditor, 166 U. S. 185.

"The suggestion that such a tax on the cattle constitutes a tax on the lands within the reasoning in the case of Pollock v. Farmer's Loan and Trust Co., 157 U. S. 429, is purely fanciful. The holding there was that a tax on rents derived from lands was substantially a tax on the land. To make the present case a similar one the tax should have been levied on the rents received by the Indians, and not on the cattle belonging to third parties. * * *

"The taxes in question here were not imposed on the business of grazing, or on the rents received by the Indians, but on the cattle as property of the lessees, and, as we have heretofore said that as such a tax is too remote and indirect to be deemed a tax or burthen on interstate commerce, so is it too remote and indirect to be regarded as an interference with the legislative power of Congress."

The Supreme Court of the United States, in the case of Central Pacific Railroad v. California, 162 U. S. 91, stated as follows:

"Although a corporation may be an agent of the United States, a state may tax its property, subject to the limitation pointed out in Railroad Co. v. Peniston, 18 Wall. 5."

In the body of the opinion, they announced the following rule:

"No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the states and has never been surrendered. It cannot be so used, indeed, as to defeat or hinder the operations of the national government; but it will be safe to conclude, in general, in reference to persons and state corporations employed in government service, that when Congress has not interposed to protect their property from state taxation, such taxation is not obnoxious to that objection."

In the case of Gromer v. Standard Dredging Co., 224 U. S. 362, it was stated:

"Property which has acquired a situs within the jurisdiction of the territory of Porto Rico is not exempt from taxation by the territory simply because it is exclusively used by the owner for carrying out a contract with the government."

In the case of Choctaw, O & G. R. Co. v. Harrison, 235 U. S. 292, the court stated:

"But it is insisted that the statute, rightly understood prescribed only an ad valorem imposition on the personal property owned by appellant—the coal at the pit's mouth— which is permissible, according to many opinions of this court."

In the case of Indian Territory Illuminating Oil Co. v. State, 240 U. S. 522, 60 L. Ed. 779, upon the question of tangible property being taxable, it was stated as follows:

"It follows from these views that the assessment against the oil company, so far as it included the leases, whether as separate objects of taxation or as represented or valued by the stock of the company, is invalid."

It is contended, however, that the Supreme Court of the United States held such property was not subject to taxation in the case of Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234, but such a contention is not supported by the syllabus in the case, nor from a reading of the opinion in the case. The syllabus indicated the only question involved in the case, and is as follows:

"The gross revenue tax imposed by Oklahoma act of May 26, 1908, sec. 6, upon coal miners or producers equal to a specified percentage of the gross receipts from the total coal produced, 'which shall be in addition to the taxes levied and collected upon an ad valorem basis upon such mining property,' and the appurtenances thereunto belonging, is an occupation or privilege tax."

It can be readily seen that the only question involved in that case was the gross production tax provided by the act of May 26, 1908, which was a tax in addition to the ad valorem tax; and in referring to whether the coal at the pit's mouth was subject to taxation, the court stated as follows:

"But it is insisted that the statute, rightly understood, prescribed only an ad valorem imposition on the personal property owned by appellant—the coal at the pit's mouth—which is permissible, according to many opinions of this court. Thompson v. Union P. R. Co., 9 Wall. 579, 19 L. Ed. 792; Union P. R. Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787. Central P. R. Co. v. California, 162 U. S. 91, 40 L. Ed. 903, 16 Sup. Ct. Rep. 766; Thomas v. Gay, 169 U. S. 264, 42 L. Ed. 740, 18 Sup. Ct. Rep. 340."

This is conclusive that the question of taxing the tangible property of the defendant upon an ad valorem basis was recognized in that case. It is further contended that Indian Territory Illuminating Oil Co. v. State, 240 U. S. 522, 60 L. Ed. 779, supports the contention that the tangible property of lessee owning a mining lease upon the tribal lands of Osage Indians was not subject to taxation. In that case there was no issue except the question of whether the lease itself was taxable, and the Supreme Court of the United States held that the lease itself was not subject to taxation. The opinion recites that the lessee had returned for taxation its tangible property in the sum of $50,000, and there was no contention that said property was not taxable. It was not even contended by the lessee that the tangible property, which consisted of derricks, casing, pipe line, etc., used in operating said Osage lease, was exempt from taxation. The quotation copied above discloses that the only question was whether the lease itself was taxable.

It is further contended that this question was settled by the Supreme Court of the United States in the case of Large Oil Co. v. Howard, 248 U. S. 549, 63 L. Ed. 416. No such construction can be placed upon that case, as the court simply in a per curiam opinion followed the holding of the court in the case of Choctaw, O. & G. R. Co. v. Harrison, and Indian Territory Illuminating Oil Co. v. State, supra, and in those cases it was conceded that the tangible property was subject to an ad valorem tax. We think that no such construction can be placed upon any of the cases as plaintiff in error attempts to place upon the same, and that no case can be found wherein the Supreme Court of the United States or any other court has held that the tangible property of a party who has a contract with the United States government is by reason of said fact exempt from taxation.

We will now direct our attention to the other question: Whether the gross production tax provided in chapter 39, Session Laws of 1916, is illegal. In doing this, it can best be determined by ascertaining whether the same is a property tax, or a tax upon the earnings of the company, or a license or occupation tax. In determining whether the same is a property tax or a license or occupation tax, we must look to the entire law upon the subject of taxation and the whole method provided for taxation.

Section 7302, Rev. Laws 1910, provides that all property within the state, except such as is exempt, shall be subject to taxation. The Legislature thereafter passed what is known as a gross production tax concerning mining property, and provided that this tax should be in lieu of all other taxes. The fifth paragraph of section 1, ch. 39, Session Laws 1916, provides as follows:

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals * * * upon the machinery, appliances and equipment used in and around any well. * * *"

This tax is made in lieu of taxes upon all of the property except the real estate which is covered by the lease and except the ore on hand on the date the property is assessed for general ad valorem taxes, and provides these two classes of property shall be taxed as other property within the taxing district in which said property 's situated at the time. Paragraph 6 then provides that:

"The State Board of Equalization, upon its own initiative, may, and upon complaint of any person who claims that he is taxed too great a rate hereunder, shall take testimony to determine whether the taxes herein imposed are greater, or less than the general ad valorem tax for all purposes would be on the property of such producer subject to taxation in the district or districts where the same is situated."

The paragraph further provides that the State Board of Equalization may lower or raise the rate to conform thereto. The force and effect of this provision of the law is to tax the property upon an ad valorem basis, and if the producer considers that the amount he pays in the way of a gross production tax at the rate provided for in said section is greater than the tax on his property would be if taxed to him upon an ad valorem basis, he may submit proof of this question to the State Board of Equalization and the State Board of Equalization may reduce the rate and thereby prevent him from being discriminated against. In other words, there shall be no discrimination in the taxation of this class of property from other classes of property that are taxed upon an ad valorem basis. It is conclusive that the intent of the Legislature was to make this tax a property tax and based upon the valuation of the property at the same rate as other property, and the same must be considered a property tax. It is simply a method to arrive at a property tax, and in its final analysis it is nothing more nor less than a property tax.

The identical question was presented to the Supreme Court of Minnesota in the case of State v. U. S. Express Co., 114 Minn. 346, the court there stating as follows:

"The gross earnings tax provided by R. L. 1905, secs. 1013-1019, is not a tax upon the earnings of express companies, or upon the companies, or their right to engage in business, but is a tax upon their property within the state."

An appeal was taken from a decision of the state court to the United States Supreme Court, being entitled United States Express Co. v. Minnesota, 223 U. S. 335, and the court there stated as follows:

"A state may not burden interstate commerce by taxing its commerce, but it may measure the value of property of a corporation engaged in interstate commerce within the state by the gross receipts, and impose a tax thereon if the same is in lieu of all taxes upon the property of such corporation."

In the body of the opinion the court stated as follows:

" ' "By whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution." Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, 697. See New York, Lake Erie & Western R. R. Co. v. Pennsylvania, 158 U. S. 431, 438, 439. The question is whether this is such a tax. It appears sufficiently perhaps from what has been said, that we are to look for a practical rather than a logical or philosophical distinction. The state must be allowed to tax the property and to tax it at its actual value as a going concern. On the other hand, the state cannot tax the interstate business. The two necessities hardly admit of an absolute logical reconciliation. Yet the distinction is now without sense. When a Legislature is trying simply to value property, it is less likely to attempt to or effect injurious regulation than when it is aiming directly at the receipts from interstate commerce. A practical line can be drawn by taking the whole scheme of taxation into account. That must be done by this court as best it can.' * * *

"The statute itself provides that the assessments under it 'shall be in lieu of all taxes upon its property'. In other words, this is the only mode prescribed in Minnesota for exercising the recognized authority of the state to tax the property of express companies as going concerns within its jurisdiction. If not taxed by this method, the property is not taxed at all. In this connection, the language of Mr. Justice Peckham in McHenry v. Alford, 168 U. S. 651, 671, while it was not necessary to the decision of the case, is, nevertheless, apposite:

" 'When it is said, as it is in this act, that the tax collected by this method shall be in lieu of all other taxes whatever, it would seem that it might be claimed with great plausibility that a tax levied under such circumstances and by such methods was not in reality a tax upon the gross earnings, but was a tax upon the lands and other property of the company, and that the method adopted of arriving at the sum which the company should pay as taxes upon its property was by taking a percentage of its gross earnings.' * * *

" 'Doubtless, no state could add to the taxation of property, according to the rule of ordinary property taxation, the burden of a license or other tax on the privilege of using, constructing, or operating an instrumentality of interstate or international commerce or for the carrying on of such commerce; but the value of property results from the use to which it is put and varies with the profitableness of that use, and by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution.'

"We think the tax here in question comes within this principle. There is no suggestion in the present record, as was shown in Fargo v. Hart, 193 U. S. 490, that the amount of the tax is unduly great, having reference to the real value of the property of the company within the state and the assessment made. The statute embraces receipts from all the business done within the state, including much which is purely local.

"Upon the whole, we think the statute falls within that class where there has been an exercise in good faith of a legitimate taxing power, the measure of which taxation is in part the proceeds of interstate commerce, which could not, in itself, be taxed, and does not fall within that class of statutes uniformly condemned in this court, which show a manifest attempt to burden the conduct of interstate commerce, such power, of course, being beyond the authority of the state."

If we apply the same reason to the facts in the case at bar, it would seem that the state in good faith has attempted to place a tax upon the property of those engaged in mining and has adopted this method and means in lieu of the ad valorem tax, and that the same should be a property tax based upon the value of the property and be a property tax. There is no contention in this case that the tax imposed is larger in proportion to the value of the tangible property of the company upon the lease, subject to taxation, than if it were assessed upon an ad valorem basis at the same rate other property in the same taxing district is assessed at.

We must, therefore, conclude that the same is not a tax upon the earnings of the company, but simply a tax upon the property of the producer that is subject to taxation.

When the state has provided this method of taxation, and provided that the tax shall be in lieu of all other taxes, and has placed around the taxpayer the safeguard that if the rate of taxation is greater than if paid upon an ad valorem basis, the State Board of Equalization may reduce the rate, certainly with this provision in the law there can be no contention that the producer is being discriminated against, nor that the state is attempting to exact an exorbitant tax from him.

It is contended, however, that the Supreme Court of the United States passed upon a similar statute in the case of Choctaw, O. & G. R. Co. v. Harrison, supra, and held the same invalid, but in this we cannot agree. The only question before the Supreme Court of the United States in that case was the construction of the gross production tax under the act of May 26, 1908, which act pro-

vided that the gross production tax should be in addition to the ad valorem tax. Since the rendition of that opinion the Legislature of this state has not only revised the gross production tax, but also the method of taxing the property of the producer. The Legislature has not only provided that the gross production tax under section 1, ch. 39, Session Laws 1916, shall be in lieu of all other taxes, but has placed a further safeguard around the taxpayer that will prevent him from being discriminated against in the payment of his tax, and has also provided that if the tax amounts to more than it would upon an ad valorem basis, the tax shall be reduced in accordance therewith, thereby not only changing the statute in the manner of taxation, but the result is different. The only way that case could apply to the facts in the case at bar would be to hold that after the Supreme Court of the United States has declared one tax law illegal, thereafter the state would be forever foreclosed from amending its law and be prevented from passing future laws to assess property in accordance with the opinions that such court has rendered.

It may be contended that the state in this instance is attempting to tax the lease because the statute provides that the tax shall be in lieu of all other property, including the lease, but in this we cannot agree. The statute is very broad, and provides that the tax shall be in lieu of taxes on all property subject to taxation. Now, if the lease is not taxable, the taxpayer has a right to submit to the State Board of Equalization a list of his property that is or would be subject to taxation upon an ad valorem basis, and the value thereof, and if the tax paid is greater than the taxpayer would pay if taxed as other property, the state has a right to reduce the rate.

It is unnecessary to decide whether any of the leases owned by plaintiff in error would be taxable, for that question is not essential in determining this appeal. The plaintiff in error did not file his complaint with the State Board of Equalization asking that the rate be reduced. He did not ask that the State Board of Equalization ascertain what property he had upon said leases that would be subject to an ad valorem tax, and request if the gross production tax amounted to more than the plaintiff in error's tax would be if his property were assessed upon an ad valorem basis, that the same be reduced. If he had done so, and the State Board had refused to reduce the rate for the reason they considered the value of the lease in determining the value of his property, then that question would be material. Until that

is done it is unnecessary to pass upon that question.

We are unable to tell from the record in the instant case the amount of property, including the concentrating plant, and other tangible property upon each lease, or the value of the same, therefore we must presume that if plaintiff was paying a tax upon an ad valorem basis, his tax would be as great as the gross production tax he is now paying, for the reason he does not complain or contend that his tax is higher than it would be if his property were taxed as other property. Under those circumstances, he has no complaint to make except to escape all taxes within that district. The statute has provided plaintiff in error with a plain and speedy remedy and afforded him adequate relief and he has failed to take advantage of the same, but in the instant case he has simply tried to defeat all of his taxes. His complaint is very similar to the complaint of the Central Pacific Railroad Co., and in passing upon its complaint the Supreme Court of the United States, in the case of State of California v. Central Pac. R. R. Co.. 162 U. S. 91, in the last paragraph of the syllabus, state as follows:

"When it is considered that the Central Pacific Company returned its franchise for assessment, declined to resort to the remedy afforded by the state laws for the correction of the assessment as made if dissatisfied therewith, or to pay its tax and bring suit to recover back the whole or any part of the tax which it claimed to be illegal, its position is not one entitled to favorable consideration; but without regard to that, the court holds, for reasons given, that the state courts rightly decided that the company had no valid defense to the causes of action proceeded on."

We therefore conclude: First, that all the tangible property owned by plaintiff in error which was used in operating the Indian lease is subject to an ad valorem tax. Second, that the gross production tax provided by chapter 39, Session Laws 1916, is not a tax upon the earnings of the producer of mining ore or upon his right to engage in business, but is a property tax based upon the property and the value thereof within the state, and is not an illegal tax.

After reaching this conclusion, under the facts in this case, the plaintiff in error is not entitled to any relief, and the State Board of Equalization did not err in overruling the protest of said plaintiff in error, and the judgment of the State Board of Equalization is therefore affirmed.

RAINEY, C. J., HARRISON, V. C. J., and PITCHFORD. JOHNSON, HIGGINS.

BAILEY, and COLLIER, JJ., concur; KANE and MILLER, JJ., dissent.

KANE, J. (dissenting). I dissented from my brothers when the opinion in this case was handed down without formally stating the grounds of my dissent. A petition for rehearing having since been filed, which is still pending, I have decided upon reflection to file a dissenting opinion for the following reasons:

(1) The question involved herein has been correctly decided contrary to views expressed in the majority opinion in the case of the Protest of the Skelton Lead & Zinc Company's Gross Production Tax, 1919, handed down December 14, 1920, and in which a petition for rehearing has since been granted.

(2) In the former case the Attorney General confessed the illegality of a gross production tax levied under the precise circumstances as the tax assailed herein, to wit: Where the leases were made by Quapaw Indians not declared incompetent at the time the leases were made, but who were later declared incompetent by the Secretary of the Interior.

(3) The precise federal question herein involved has been definitely decided by the Supreme Court of the United States contrary to the views expressed in the majority opinion in several well-considered cases.

(4) As in my judgment it would be inimical to the business involved as well as to the interest of the state again to open for discussion a federal question which seems to me to be definitely put at rest by repeated decisions of the highest court in the land having jurisdiction thereof, I deem it to be my duty to the members of the court who have come on to the bench since the majority opinion was handed down to file a dissenting opinion in order that they, as well as the members who participated in the majority opinion, may be advised of my views in a definite way, before passing upon the pending petition for rehearing.

In the Matter of the Protest of the Skelton Lead & Zinc Company's Gross Production Tax, 1919, the protest of the company questioned the validity of the gross production tax as applied to leases made by the Quapaw Indians under three different circumstances as follows:

First. Leases made by Indians who have never been declared incompetent by the Secretary of the Interior under the authority to do so conferred by that part of the pro-

visions of the act of Congress allotting the lands of the Quapaw Indians in severalty.

Second. Leases made by Indians not declared incompetent at the time the leases were made but who were later declared incompetent by the Secretary of the Interior.

Third. Indians whose leases were made after they were declared incompetent, such leases being at all times subject to the supervision and control of the Department of the Interior.

In the case at bar the taxes, as we have seen, were levied under the second set of circumstances. In the original opinion in the Skelton Lead & Zinc Company Case, supra, which upon petition for rehearing was withdrawn and replaced by another opinion reaching a contrary conclusion (In re Skelton Lead & Zinc Co. Gross Production Tax, 1919, 81 Okla. 134, 197 Pac. 495), the court discussed the question presented for review as follows:

"As the Attorney General in his brief concedes that he is unable to draw any substantial distinction between leases made under the second and third circumstances stated above and the leases made under the circumstances existing in the cases wherein the Supreme Court has heretofore held that the lessees were federal agencies and not subject to taxation pursuant to the laws of the state, it will not be necessary to notice the questions presented under those two subheads. The cases referred to by the Attorney General, which we agree are in point to the effect stated, are as follows: Choctaw, O. & Gulf R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 60 L. Ed. 770; Large Oil Co. v. E. B. Howard, State Auditor of Oklahoma, 248 U. S. 549."

In the case at bar the Attorney General has not filed a brief, for the reason, no doubt, that the cause was tried upon the same agreed statement of facts as the Protest of the Skelton Lead & Zinc Co. Case, supra, and he is still satisfied with his view as to the controlling effect of the Supreme Court cases just cited and considers them decisive of the case at bar. This, it seems to me, ought to set at rest forever the question involved herein. But in the face of this the court upon its own initiative has undertaken to set forth reasons why the cases just cited are erroneous, and therefore not controlling, and I wish briefly to notice some of the points of distinction pointed out by the court in the majority opinion.

In the first place, without overruling the construction placed upon the present gross production law by this court in Large Oil

Company v. Howard, 63 Okla. 143, 163 Pac. 537, the court holds that, inasmuch as the taxes levied under this act are in lieu of all other taxes and the act further provides that if the tax assessed is greater or less than the tax on the property of said producer would be if taxed upon an ad valorem basis, the State Board of Equalization may lower or raise the rate to make the tax conform to the prescribed standard, the law does not impose a tax upon the business of the producer nor upon his mineral leases nor upon his mineral rights, but does, when rightly understood, in effect impose a tax upon the producer's tangible property within the state, which is permissible.

While these are the precise grounds unavailingly urged by the state authorities for upholding the gross production law of 1908 in Railroad Co. v. Harrison, supra, and the present law in Large Oil Co. v. Howard, supra, and the other cases cited, the right of the state to tax these federal agencies or their property, it seems to me, does not turn so much on the question, what is the nature of the tax, as upon whether the tax does in truth deprive the federal agency of the power to serve the government as it was intended to serve it—does it hinder the efficient exercise of its power? Union Pacific R. Co. v. Peniston, 18 Wall. 550, 21 L. Ed. 787.

No matter what the state courts may hold as to the nature of the tax, this still is the federal question, which can be answered only by taking the whole scheme of taxation into account. And the application of this settled principle to particular cases, so as not to hedge on the taxing power of the state on the one hand, or the power of the federal government to protect its own agencies on the other, is not without some difficulty. As was said by Mr. Justice Day in discussing a similar question in United States Express Co. v. Minnesota, 235 U. S. 335:

"The state must be allowed to tax the property and to tax it at its actual value as a going concern. On the other hand, the state cannot tax the interstate business. The two necessities hardly admit of an absolute logical reconciliation. Yet the distinction is not without sense. When a Legislature is trying simply to value property, it is less likely to attempt to or effect injurious regulation than when it is aiming directly at the receipts from interstate commerce. A practical line can be drawn by taking the whole scheme of taxation into account. That must be done by this court as best it can."

Assuming that these cases, in so far as applicable, state the rule correctly, let us inquire what items of property or elements

of value must be taken into consideration by the taxing officers in making the levy under the present act. Section 1 of chapter 39, Sess. Laws 1916, provides that every person engaged in the mining or production of ores bearing lead, zinc, jack, etc., shall pay to the State Auditor a tax equal to one-half of one per cent. of the gross value of such ores, less the royalty interest. Another part of the same section provides that the payment of the taxes thus imposed shall be in full and in lieu of all taxes by the state, counties, cities, townships, school districts, and other municipalities upon any property rights attached or inherent in the rights to said mineral leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver, or copper, etc., and upon mining rights and privileges for the minerals aforesaid belonging or appertaining to land.

This part of the section unquestionably provides for a straight gross production tax based on the gross value of all the ores, less the royalty, produced by the taxpayer by the use of all the instrumentalities pertaining to his business.

Another part of the same section provides that the State Board of Equalization, upon its own initiative, may, and upon complaint of any person who claims that he is taxed too great a rate herein shall, take testimony to determine whether the taxes herein imposed are greater or less than the general ad valorem tax for all purposes would be on the property of such producer subject to taxation for the district or districts where the same is situated, including the value of oil, gas, or mineral lease, or of the mining or mineral rights, the machinery, equipment, or appliances used in the actual operation of, in and around any such well or mine, the value of the oil, gas, asphalt, or any of the said mineral ores produced and any other element of taxable value in lieu of which this tax herein is levied. The said board shall have power to and it shall be its duty to raise or lower the rates herein imposed to conform thereto.

Now an analysis of the applicable parts of the act discloses that the first part of section 1 provides for a straight gross production tax equal to one-half of one per centum of the gross value of ores bearing lead, zinc, jack, etc., produced, less the royalty; and that the second part of the act merely makes it the duty of the State Board of Equalization, either upon its own initiative or upon complaint of the taxpayer, to see that the taxes thus imposed are not greater or less than the general ad valorem taxes for all purposes would be upon the property of such producer, subject to taxation, including

the value of oil, gas, or mineral lease, or of the mining or mineral rights, the machinery, equipment, appliances used in the actual operation of, in and around such well or mine, the value of the oil, gas, asphalt, or any of the said mineral ores produced and any other element of taxable value in lieu of which the tax is levied.

Under this act, as I understand it, and as it was construed by this court in Exchange Oil Co. v. State, 80 Okla. 52, 193 Pac. 999, recently handed down, the State Board of Equalization, in determining whether the gross production tax is greater or less than the general ad valorem tax for all purposes would be on the property of any particular producer or taxpayer, must consider not only the value of the tangible property of the producer, but also the value of the mineral leases or mining or mineral rights, if it follows the mandate of the statute. Therefore, assuming that the tax imposed amounts to no more than an ad valorem tax on the property would be, it is fairly obvious that the ruling of the court is in direct conflict with the ruling of the Supreme Court of the United States in Indian Territory Illuminating Oil Co. v. Oklahoma. supra, wherein it was held that such leases cannot be taxed either directly or indirectly. The Illuminating Oil Co. Case did not turn upon the question whether the leases involved were tangible or intangible personal property, or whether the taxes assailed were based upon a gross production or an ad valorem basis. It was conceded that the leases were personal property, but the court held that they were not taxable by the state either as entities or vicariously by taxing the stock of the corporation owning them, because they were the franchise by which the company was authorized to do business with the Indians, and to permit the state to tax them would necessarily interfere with an instrumentality through which the United States was performing its duty to the Indians.

"A tax upon the leases," says the learned Justice who delivered the opinion of the court, "is a tax upon the power to make them, and could be used to destroy the power to make them."

In the case at bar, after all is said that profitably can be said in relation to the nature of the tax sought to be imposed by the present act, it still remains fairly obvious that the state Legislature was aiming directly at the receipts of the producer by providing a gross production tax based upon the gross value of all ores bearing lead, zinc, or jack produced, and that the State Board of Equalization has no power to

change this basis of taxation, that is, it has no power to change the valuation placed upon the gross production by the State Auditor. If, upon investigation, the State Board of Equalization finds the tax to be too high or too low, measured by the prescribed standard, it adjusts the matter, not by changing the valuation of the gross production, but by changing the rate of taxation. Exchange Oil Co. v. State, supra. The result of this is that whatever the State Board of Equalization finds the rate shall be, the resulting taxation still is based upon the total value of the gross production as found by the State Auditor, and necessarily must be a burden upon the entire business and property of the producer, including, as the statute prescribes, any licenses, leases, or mineral rights operated as a federal agency. A system of this kind cannot be enforced against this federal agency without interfering with an instrumentality through which the United States is performing its duty to the Indians. California v. Pacific Railroad Co., 127 U. S. 1.

This is the principal vice of the present law as applied to federal agencies. That was the vice of the gross production law of 1908, which it was held could not be enforced against a federal agency in Railroad Company v. Harrison, supra. In the present act the Legislature sought to remedy what it conceived to be the defect in the former law by declaring the tax imposed to be in lieu of all other taxation. This, however, in my opinion, was not the defect which made the law invalid, but it was invalid, as I have heretofore pointed out, because by it the state sought to cast an unauthorized burden of taxation upon the entire business, franchises, and property of a federal agency. And for this reason alone the Supreme Court of the United States in the Large Oil Company Case held the present act invalid upon the authority of Railroad Company v. Harrison and the other cases cited holding previous acts invalid, without noticing the distinction between the different acts so ably and strenuously pointed out by the Attorney General and so stressed in the opinion of the Supreme Court of the state in the Large Oil Co. Case and the dissenting opinion prepared by the Chief Justice in the Protest of the Skelton Lead & Zinc Company, supra, and in the opinion of the majority of the court in the present case.

The Chief Justice in the dissenting opinion in the Skelton Case just referred to and the court in the majority opinion in the case at bar concede that the question involved in the Large Oil Co. Case, supra, grew out of the present act and was precisely the same as the question involved in the case at bar. They seem, however, to be of the opinion that that case is erroneous and not controlling, apparently assuming that the Supreme Court did not notice the real question involved because it did not discuss at length the distinctions pointed out by the state authorities, hereinbefore referred to, between the act of 1908 and the act of 1916. The Attorney General, as we have seen, confesses his inability to distinguish this case and the Skelton Lead & Zinc Co. Case, supra, from the various cases decided by the Supreme Court of the United States.

In these circumstances I deem it to be the duty of this court to abide by the decisions of the Supreme Court of the United States on federal questions, trusting that high court to correct on appeal its own rulings many times repeated, if perchance it finds that error has crept into its former opinions.

For the reasons stated, I respectfully dissent from the majority opinion.

I am authorized to say that Mr. Justice MILLER concurs in this dissenting opinion.